UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLUETOOTH SIG, INC.,

    Plaintiff,

    v.

UNITED STATES OF AMERICA,

    Defendant.

CASE NO. C05-1778-JCC

ORDER

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 47), Defendant's Response (Dkt. No. 52), and Plaintiff's Reply (Dkt. No. 58), as well as Defendant's Motion for Summary Judgment (Dkt. No. 49), Plaintiff's Response (Dkt. No. 56), and Defendant's Reply (Dkt. No. 57). Having considered the parties' briefing and supporting documentation, and determining that oral argument is unnecessary, the Court hereby finds and rules as follows.

## I.    BACKGROUND

Plaintiff Bluetooth SIG, Inc. (the "Association") was incorporated as a Delaware nonprofit corporation on November 13, 2000 to advance its members' "common business interest in the development and regulation of technical standards for the compatibility and interoperability of wireless products and devices within a wireless personal area network ('WPAN')." (Pl.'s Mot. 2 (Dkt. No. 47).) The Association currently has 4,148 members, including major technology companies,[1] that share an

---

[1] The Complaint names Motorola, Inc., Nokia Corporation, Microsoft Corporation, Apple Computer, Inc., IBM Corporation, Toshiba Corporation, Sony Corporation, and Hewlett-Packard Company as part of a non-exhaustive list of representative members. (Compl. ¶ 15 (Dkt. No. 1).)

ORDER – 1

interest in selling products and devices that could be part of a consumer's WPAN, including but not limited to computers, printers, mobile telephones, telephone headsets, and digital cameras. (Compl. ¶¶ 12–13 (Dkt. No. 1).) In furtherance of this objective, the Association performs a variety of functions, which it characterizes as falling into three categories: "(1) development of specifications and use applications; (2) development of testing procedures and trademark usage; and (3) promotion of consumer awareness and marketing." (Pl.'s Mot. 3 (Dkt. No. 47).) The Association conducts these activities through its "Bluetooth" technology and trademark.

"Bluetooth" is a radio-based technology that supports short-range, wireless connections between different devices. (*Id.* at 10.) It is not the only technology for wireless connectivity within a WPAN, though the viability of current alternatives is a subject of much debate between the parties. (*See*, *e.g.*, Pl.'s Mot. 11–12 (Dkt. No. 47); Def.'s Resp. 2–3 (Dkt. No. 52).) The Association's core Bluetooth technology has been expanded for use in products across industries with the use of application profiles. (Def.'s Mot. 5 (Dkt. No. 49).) It is not the case that all products equipped with Bluetooth technology are automatically interoperable. Rather, Bluetooth-compliant products must also be designed to work together. (Def.'s Mot. 9 (Dkt. No. 49).)

The first activity of the Association, enumerated above, is the "development of specifications and use applications." This refers to the process by which the Association, through its working groups, develops the Bluetooth specification, which is "the written document defining the Bluetooth technology." (Pl.'s Mot. 3 (Dkt. No. 47).) This specification has changed, and presumably will continue to change over time, and is the collaborative work product of some subset of the Association's members. (*Id.*)

The second type of activity in which the Association engages is the "development of testing procedures and trademark usage." The testing procedures are those the Association uses to decide whether a particular product, manufactured by a member of the Association, meets Bluetooth specifications. Products that meet the specification are eligible for listing on the Association's website as a Bluetooth-qualified product, and may be marketed by the manufacturer with the Bluetooth trademark.

ORDER – 2

(*Id.* at 4–5.) The Association has employed two different testing procedures since its inception. At the times relevant to this lawsuit, the procedure in place required that a member manufacturer present its product for testing at an "independent" testing facility. (*Id.*) It is not entirely clear what Plaintiff means by "independent" in this context, since it appears that any such testing facility must be a member of, and pay an annual fee to the Association, in addition to being an accredited test laboratory. (*Id.* at 5.) The results are then taken to an individual trained to review such test results for certification. These individuals must be approved by the Association, and as with approved testing facilities, they must pay an annual fee to the Association. (*Id.* at 5.) These testing facilities and individuals are responsible for setting the fees charged to manufacturers for the services they render. (*Id.*) In addition to its role in the testing and certification process, the Association also protects the Bluetooth trademark, which includes identifying violations, informing suspected violators of their actions, demanding compliance, and possibly litigation. (*Id.* at 6–7.) Finally, the third set of activities engaged in by the Association is promotion of consumer awareness and marketing of the Bluetooth brand. (*Id.* at 7.)

The Association is comprised of three classes of members: Promoter Members, Associate Members and Adopter Members. (*Id.* at 8.) Adopter-level membership is free of charge. The main advantage conferred by such membership appears to be the right to list a product as Bluetooth-compliant and to use the Bluetooth trademark, which Adopter members may do upon payment of a $10,000 listing fee and qualification of the product according to the process described above. Adopter members can also access something called the Profile Tuning Suite ("PTS") with a one-time payment of $7,500. (*Id.* at 9–10.) The next step up is Associate-level membership, which offers free access to PTS, the right to "sit on developmental working groups, study groups and committees," a fifty percent discount on the listing fee charged to Adopter members, and the right to attend various meetings and access certain research reports. However, Associate members are also the only class that pays an annual fee, ranging from $7,500 to $35,000 per year depending on whether the member's total revenues exceed $100 million. (*Id.* at 9.) Finally, Promoter members have all the privileges of Associate level membership, and also hold a

ORDER – 3

seat on the Association's board of directors. It appears that the Promoter class is not simply available to all comers by application; it has been expanded from the original five member group only once, when it added three new members based on invitation and payment of a $350,000 fee. (Def.'s Resp. 4 n.4 (Dkt. No. 52); Pl.'s Mot. 8–9 (Dkt. No. 47).) Promoter-level members also have their names and logos displayed on the Association's web sites and some of its documents. (Pl.'s Resp. 6 (Dkt. No. 56).)

In early 2002, the Association filed paperwork with the Internal Revenue Service ("IRS") claiming an exemption from federal income tax as a "business league" under Code Section 501(c)(6). (Pl.'s Mot. 12 (Dkt. No. 47).) On or about February 23, 2004, the IRS issued a final adverse ruling stating that the Association did not qualify for exemption under 501(c)(6). (*Id*.) Consequently, the Association filed corporate income tax returns for its 2000, 2001, and 2002 tax years, and claims that it has paid a total of $928,730.96 for those respective years. After filing refund claims to no avail, the Association brought this action seeking a full federal income tax refund for the years listed above, or in the alternative, a refund of penalties, additions to tax and interest. (Compl. ¶¶ 57–65 (Dkt. No. 1).) Both parties have now filed motions for summary judgment. In addition to requesting summary judgment on its refund claim, Plaintiff also seeks a declaration that it is exempt from federal income tax under IRC 501(c)(6). (Pl.'s Mot. 1 (Dkt. No. 47).)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is no genuine issue for trial unless there is sufficient evidence to support a jury verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 250. The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Id*. at 257. Furthermore, the Court must draw all reasonable inferences in favor of the nonmoving party.

ORDER – 4

*See F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994).

In addition to demonstrating that there are no questions of material fact, the moving party must also show that it is entitled to judgment as a matter of law. *Smith v. Univ. of Washington Law School*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim for which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In tax refund suits, it is "a settled principle that exemptions from taxation are not to be implied; they must be unambiguously proved." *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988). Therefore, "taxpayers must prove unambiguously that they are entitled to exemptions," and "if 'doubts are nicely balanced' regarding the applicability of a tax exemption, the exemption must be accorded its more limited interpretation." *Tupper v. United States*, 134 F.3d 444, 446 (1st Cir. 1998) (quoting *Trotter v. Tennessee*, 290 U.S. 354, 356 (1933)). Accordingly, while the Court construes all factual ambiguities in favor of the non-moving party, "legal ambiguities must be resolved in favor of the United States." *Tupper*, 134 F.3d at 446. Furthermore, "courts conduct a *de novo* review of the correctness of the assessment, imposing the risk of nonpersuasion on the taxpayer." Only in limited circumstances where a particular administrative determination is shown to be "without rational foundation," is it not "accorded a rebuttable presumption of correctness." *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir. 1987).

### B.     "Business League" Under Section 501(c)(6) of the IRS Code

The parties agree that no issues of material fact preclude summary judgment in this case, and therefore they center their dispute on whether the Association is entitled to an exemption under IRC 501(c)(6). This provision of the IRS Code offers exemptions for:

> Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

ORDER – 5

26 U.S.C. § 501(c)(6). It is Plaintiff's contention that the Association is a "business league" as that term is defined in the federal regulations.[2] To decide whether a particular entity qualifies as a "business league" under the Code, courts in this circuit have distilled the definition set forth in the regulations into a six factor test, which requires that the entity be: "(1) of persons having a common business interest; (2) whose purpose is to promote the common business interest; (3) not organized for profit; (4) that does not engage in a business ordinarily conducted for profit; (5) whose activities are directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons; (6) of the same general class as a chamber of commerce or a board of trade." *Engineers Club of San Francisco v. United States*, 791 F.2d 686, 689 (9th Cir. 1986).

While Defendant does not concede any of the six factors set forth above, the crux of the dispute is whether Plaintiff has demonstrated that it satisfies the fourth and fifth factors. (Def.'s Mot. 16–24 (Dkt. No. 49).)

        i.    "Business ordinarily conducted for profit"

Defendant contends that the Association's activities, in particular its development and marketing of the Bluetooth technology and brand, are of a kind ordinarily carried on for profit; Plaintiff asserts that these activities are consistent with those of entities recognized as exempt under § 501(c)(6). (Def.'s Mot. 22–23 (Dkt. No. 49); Pl.'s 17–19 (Dkt. No. 56).) While Plaintiff is surely correct that the mere fact that it conducts testing and promotional activity does not disqualify the Association from the exemption, *see American Plywood Ass'n v. United States*, 267 F.Supp. 830, 833–36 (W.D. Wash. 1967), it does beget a

---

[2] "A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league . . ." 26 C.F.R. § 1.501(c)(6)-1.

ORDER – 6

fact-intensive, contextual assessment of the Association's activities. Such assessment yields the distinct impression that the Association "engage[s] in a business ordinarily conducted for profit." *Engineers Club of San Francisco*, 791 F.2d at 689.

To reach this conclusion, it is necessary to first understand the relevant "business." Whereas the Association's members are in the business of selling cellular phones, computers, or other such devices, the question here is whether the Association itself, as a distinct entity, operates as a business ordinarily conducted for profit. The Association has created a particular technology standard that enables multiple devices, of different types and perhaps by different manufacturers, to be used together. It appears that Bluetooth is the most developed and prevalent of such technologies for use within a designated range, though Plaintiff does not contend that other technologies could not or have not been developed to perform the same function. The mere fact that the Bluetooth specification is always changing demonstrates that there is not one single magic formula in the universe of such technologies for use within a WPAN. Nonetheless, Bluetooth's dominance in this regard, perhaps a testament to the cooperative efforts of its members, has made its trademark a valuable commodity.

As with any commodity with value in the marketplace, it is for sale. That is, a manufacturer can buy the right to sell a particular product, such as a cellular phone, as "Bluetooth compliant," by doing at least two things. First, it must become a member of the Association at one of the three levels of membership, which may or may not require payment of a fee. Second, it must undergo and pay for the testing and qualification procedures set forth by the Association, and upon completion, it must pay a listing fee to the Association of $5,000–$10,000. (Def.'s Mot. 9 (Dkt. No. 49).) For those who might wish to participate in developing the Bluetooth specification, membership at a level requiring payment of some kind of fee appears to be required. That this is a collaborative effort by competitors does not change the fact that the Association is developing and selling a "product," much like a business ordinarily conducted for profit. Finally, as with any business with valuable proprietary information, the Association defends its property interests against those who would appropriate it without paying by threat of

ORDER – 7

litigation.

Plaintiff relies heavily on *American Plywood Association v. United States*, 267 F.Supp. 830 (W.D. Wash. 1967) for the proposition that its activities are consistent with a tax-exempt "business league." (Pl.'s Resp. 17–18 (Dkt. No. 56).) In that case, the court held that a nonprofit corporation comprised of softwood plywood manufacturers was entitled to a tax exemption under § 501(c)(6). Specifically, the court found that the association's quality control activities, including inspection and testing based on quality standards developed by the association, and its promotional activities, which included use of the association's trademark for compliant grade plywood, did not constitute such "principal activities" as would disqualify the association from the exemption. (*Id.* at 833–36.)

While not bound by the holding in *American Plywood*, no evaluation of its merits is necessary here, since it is distinguishable from the case at bar. In casting its lot with *American Plywood*, Plaintiff points to a number of similarities between the trade association in that case and the Association here. Both were advocating wider use of a product; both established testing and qualification standards; both established and promoted trademarks. However, there is also at least one significant difference between the two organizations. Whereas the plywood association served as a vehicle for advancing a common and pre-existing interest between members, the Association in this case was formed to *create* a common interest between its members. Put another way, the product in *American Plywood* was something the members were already selling to begin with; the product here is something the members banded together to create. Thus, the collective enterprise of the Association derives from the fact that it has created a thing of value, which its members can then use to enhance the value of the products they sell.

This is a distinction of consequence under the rationale of *American Plywood*, because of that court's emphasis on "principal" and "incidental" activities. *American Plywood*, 267 F.Supp. at 832–33 ("The rule is well established that a trade association whose main purpose justifies exemption from income tax will not forfeit tax exempt status by engaging in incidental activities which, standing alone, would be subject to taxation"). In delineating principal activities from incidental activities in that case, it

ORDER – 8

was significant that the association's members came together with a common interest in expanding the use of plywood as a building material. While they surely sought to compete with each other over whose plywood was better, they could all agree that selling more plywood was better for everyone, and it was this latter purpose for which the association was principally formed. Thus, while that association's quality control and promotional activities did create a basis for choosing *between* plywood manufacturers,[3] this was "incidental" to the organization's main purpose, which was to broaden the use of plywood in the building materials market. In the present case, the Association creates, markets, and sells a thing of value. That it also helps the Association's members sell their products does not change this fact. Furthermore, it can be no answer that, as Plaintiff asserts, Bluetooth is better characterized as a "standard" rather than a "brand." (Pl.'s Resp. 5 (Dkt. No. 56).) The Bluetooth specification and accompanying trademark is obviously something worth paying for, and therefore the standard *is* the brand. In this way, the Association's activities are more like a garden variety business than a business league or chamber of commerce.

        ii.        "Line of business" versus "particular services for individual persons"

Plaintiff must also demonstrate that its "activities are directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons," in order to qualify for an exemption under § 501(c)(6). *Engineers Club of San Francisco*, 791 F.2d at 689. Defendant contends that Plaintiff's activities do not improve business conditions for "one or more lines of business," but rather offer "particular services" for individual members. (Def.'s Mot. 16–22 (Dkt. No. 49).) To refute this claim, Plaintiff again relies on *American Plywood Association v. United States*, 267 F.Supp. 830 (W.D. Wash. 1967).

A number of cases over the years have wrestled with this factor in applying the § 501(c)(6) exemption. Some of these cases place particular emphasis on how the organization's activities benefit a

---

[3] The rationale being that plywood meeting the association's criteria and bearing its trademark presumably had an advantage over plywood that did not.

ORDER – 9

particular brand or manufacturer at the expense of others, therefore failing to meet the "line of business" test. Drawing an analogy with First Amendment jurisprudence, the problem is that the organization's activities are not "viewpoint neutral" in the marketplace. Thus, in *National Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472 (1979), a trade organization for muffler dealers failed to demonstrate exempt status because its membership was confined to dealers franchised by one particular dealer, Midas International Corporation, to the exclusion of other muffler dealers. Similarly, *Guide Int'l Corp. v. United States* involved a nonprofit organization whose "principal activity [was] the sponsorship of week-long conferences that [were] held three times a year and focus [*sic*] on data processing matters." 948 F.2d 360, 361 (7th Cir. 1991). There, the court found that even though the organization's stated purpose was "to facilitate the use and exchange of information regarding data processing equipment in general," the primary beneficiary of these activities was one company, IBM, which represented "only *a segment* (70 to 75%) of the mainframe computer business, not a line of business." (*Id*. at 362 (emphasis in original)). Thus, the organizations in *National Muffler* and *Guide Int'l* failed to show exempt status because they effectively put a thumb on the scale in favor of a particular manufacturer within an industry.

      Other cases applying this analysis upheld denials of exemption by emphasizing asymmetrical benefits for the organization's members, rather than for a certain manufacturer. For example, *Engineers Club of San Francisco* involved an organization that "serve[d] its members, and the professional societies to which they belong, by providing meetings and meeting space, logistical support, a location for operations, mailing service, telephone service, storage of records, and other facilities and services." Acknowledging that "[o]rganizations frequently fail to qualify for business league status even though their activities confer collective benefits," the court found that the Club performed services "for individual persons and organizations rather than the engineering profession as a whole." (*Id*. at 690.) Similarly, in *MIB, Inc. v. Comm'r of Internal Revenue*, 734 F.2d 71 (1st Cir. 1984), the court found that a nonprofit corporation that provided a data bank for exchanging information in the life insurance industry was not exempt as a "business league." The court framed the "ultimate inquiry [as] whether the association's

ORDER – 10

activities advance the members' interests generally, by virtue of their membership in the industry, or whether they assist members in the pursuit of their individual businesses." (*Id.* at 78.) While calling the organization's activities "totally commendable," the court noted that only members of the organization had access to the data bank, and therefore despite "various indirect and intangible benefits for the insurance industry as a whole," the organization was essentially providing "particular services for individual persons." (*Id.* at 77.) The court also explained that "[w]hen each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not . . . 'inherently group benefits.'" (*Id.* at 79 (quoting *Evanston-North Shore Bd. of Realtors v. United States*, 320 F.2d 375, 379 (Ct. Cl. 1963))).

Defendant maintains that the Association in this case devotes its activities "to the promotion of a particular product at the expense of others in the industry." (Def.'s Mot. 19 (Dkt. No. 49) (quoting *National Muffler*, 440 U.S. at 483–84).) On this theory, "Bluetooth technology is not an industry; rather it is a brand of technology which exists in and competes across multiple industries." (Def.'s Mot. 20 (Dkt. No. 49).) Plaintiff responds first by arguing that it does in fact represent an entire line of business because "Bluetooth technology is so unique that the overwhelming majority of Bluetooth customers could not replace it with another technology on reasonable commercial terms." (Pl.'s Resp. 8 (Dkt. No. 56).) Responding to Defendant's claim that it performs particular services for individual members, the Association emphasizes the group benefits conferred by its activities: "As in *American Plywood*, the Association's existence has generated consumer awareness of the availability and reliability of devices that transmit data within a WPAN, and thereby benefited [*sic*] unqualified WPAN products and nonmember manufacturers." (*Id.* at 15.)

The Court begins by noting that an "industry" can be a somewhat malleable concept. For this reason, it is debatable what the relevant industry is here. Defendant's position is that Bluetooth technology is not an industry, but rather a competitor in multiple industries (i.e. personal computers, cell phones, etc.). Plaintiff chooses to define the relevant industry at a higher level of specificity (WPAN

ORDER – 11

technology), and then asserts that Bluetooth, as a standard for wireless connectivity, is the only practical option and therefore effectively represents that industry. Whatever its merits, Plaintiff's position is a distinct departure from the posture of the organization in *American Plywood*. In that case, the organization did not purport to represent the plywood *certification* "industry"; it represented the plywood industry, on whose behalf it conducted testing and certification. This is just to say that in the cited cases, the relevant industry was what members did aside from the particular organization; it was not what they developed as a result of their membership.

The stake of the parties' disagreement on how to define the relevant industry is whether *National Mufflers* and *Guide Int'l* control this case. Regardless of how this question is answered, it is clear that the Association performs "particular services for individual persons," as set forth in *Engineers Club* and *MIB*, and therefore fails to demonstrate it is a "business league" within the meaning of the IRS Code. That is, even assuming that the Association's activities do not place a thumb on the scale in favor of a particular brand or manufacturer within an industry, they most certainly inhere to the exclusive benefit of its members. It is undisputed that use of the Bluetooth trademark is absolutely limited to members who pay the appropriate listing fee. In this way, the service provided by the Association is largely indistinguishable from the data bank and information exchange provided by the nonprofit corporation in *MIB*. There, as here, something of value is offered to all comers on the condition that they pay for it, and the benefits are in proportion to the contribution.

Furthermore, that the service may have "indirect and intangible benefits" for the industry as a whole, however defined, is not sufficient. *MIB, Inc.*, 734 F.2d at 77. In this case, it is hardly clear that the benefits to nonmembers of the Association are even so much as "indirect" or "intangible." It strains credulity for Plaintiff to argue that by "generat[ing] consumer awareness of the availability and reliability of devices that transmit data within a WPAN," the Association's activities somehow benefit "unqualified WPAN products and nonmember manufacturers." (Pl.'s Resp. 15 (Dkt. No. 56).) Taking Plaintiff's factual representations as true, the rationale would have to be that would-be consumers of products with

ORDER – 12

wireless technology, when presented with a "choice" of a product with "no reasonable commercial substitute," would opt for the unreasonable choice with greater frequency because of how impressed they are with the Bluetooth brand. Both simple logic and Bluetooth's dominant market position belie this theory. From the standpoint of manufacturers, Bluetooth quite simply benefits those who use it, which is why it is for sale.

### C. Other Administrative Determinations

Plaintiff asserts that the Internal Revenue Service has treated similarly situated entities differently than the Association with respect to exemption under § 501(c)(6). (*See*, *e.g.*, Pl.'s Mot. 12 (Dkt. No. 47).) Defendant's response is simply that the Court may not take these or other administrative determinations into account to decide this case. (*See*, *e.g.*, Def.'s Resp. 7–12 (Dkt. No. 52).) In reply, Plaintiff argues that the cited administrative determinations are at least instructive for how the Court should make its *de novo* determination. (Pl.'s Reply 9 (Dkt. No. 58).)

While the IRS would obviously be well-advised to treat similarly situated taxpayers similarly, there is simply not enough information on the record for the Court to draw the comparison Plaintiff requests. As the foregoing analysis attests, the question of whether a particular entity is a "business league" under IRC § 501(c)(6) is a highly contextual, fact-intensive inquiry. That the tax-exempt entities cited by Plaintiff are also "standard-setting associations" is hardly sufficient for the Court to decide that they have been accorded disparate treatment. More importantly, the Court is satisfied that whatever the merits of the IRS' prior determinations, this one was a sound interpretation of the Code.

### D. Plaintiff's Claim for Refund of Penalties, Additions to Tax and Interest

In Count II of the Complaint, Plaintiff requests a refund of penalties, additions to tax and interest if it is found that the Association was subject to federal income tax during its 2000 tax year. (Dkt. No. 1.) Plaintiff's position is that its failure to file or pay federal income tax for that year was "due to reasonable cause and not willful neglect . . ." (Compl. ¶ 65 (Dkt. No. 1).) It appears that Defendant's Motion for Summary Judgment does not reach this claim, and therefore the Court has no basis upon which to render

ORDER – 13

a decision.

## III. CONCLUSION

The issue decided here is not whether the Association's activities are socially and economically beneficial. Certainly the stature of the companies comprising the Association's membership would suggest that its activities at the very least make good business sense. The issue is whether the Association qualifies as a "business league" under § 501(c)(6) of the tax code. For this proposition, the Court decides in the negative.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Dkt. No. 47) is DENIED, and Defendant's Motion for Summary Judgment (Dkt. No. 49) is GRANTED. Specifically, Count I of the Complaint is dismissed with prejudice. The parties have since moved to continue the trial date in this matter. (Dkt. No. 66.) That motion is hereby GRANTED and therefore the new trial date is April 28, 2008. However, since the parties contend that no issues of material fact remain in this case, they are instructed to file a motion concerning the issue raised by Count II of the Complaint by February 22, 2008.

SO ORDERED this 1st day of February, 2008.

_John C. Coughenour_
John C. Coughenour
United States District Judge

ORDER – 14